Filed 1/4/21  P. v. Carpenter CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057661 |
| v. | (Super. Ct. No. 15NF1732) |
| KWAME ADOM CARPENTER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Kwame Adom Carpenter killed his wife and six-month-old son with a butcher knife. A jury convicted him of two counts of premeditated and deliberate first degree murder, found true a multiple-murder special-circumstance allegation, and found he used a dangerous weapon in the commission of the murders. The trial court sentenced him to two terms of life without the possibility of parole, with two concurrent two-year sentences for the knife-use enhancements.

Defendant raises five claims on appeal: (1) There was insufficient evidence of premeditation and deliberation. (2) The prosecutor committed prejudicial misconduct during his closing argument. (3) The trial court prejudicially erred by instructing the jury about motive. (4) The court also erred by giving consciousness of guilt instructions regarding defendant's false exculpatory statements, his hiding of evidence, and his flight. (5) Finally, the court improperly imposed a parole revocation fine on defendant's life without possibility of parole sentences. We reject all five contentions and affirm.

## FACTS

Because defendant raises a sufficiency of the evidence claim as to premeditation and deliberation, we lay out the underlying facts in some detail, doing so in the light most favorable to the jury's verdicts. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the specific issues defendant raises on appeal are found in the discussion below.

Defendant lived in a two-bedroom Anaheim apartment with his wife, Moureen Wanjiku Gathua-Carpenter (Moureen), their six-month-old son, Kyan Adom Gathua-Carpenter (Kyan), and his mother-in-law. Defendant moved out after Moureen accused him of having an affair. When he returned about a week later, Moureen and defendant went to church counseling in order to work on their marriage. After a month, defendant again moved out following another argument surrounding his extra-marital relationship.

2

Two weeks later, after defendant had once more returned, Moureen approached a deliveryman at the apartment complex and pleaded with him to call 911. She was agitated and appeared to have been crying. Defendant walked up and, in a normal speaking voice, said something like, "Oh, come here baby. Let's talk about it. Let's talk about it. Think about us. Think about our kid." He grabbed Moureen's arm to bring her back to their apartment. She tried to pull away, saying something like, "Fuck, no," "Get away from me," or "It's over. We're done."

The deliveryman went to the apartment complex office and told the apartment manager what had happened and asked her to call 911. The apartment manager grabbed her keys and phone and headed to defendant's apartment. As she approached, she heard a baby crying very loudly and noticed a pair of shoes lying in the courtyard. Defendant was standing just outside the apartment's open door, and the manager asked him what was going on. He replied, "Call the police." She asked, "How is the baby?" Defendant said the baby was fine, but again told her to call the police. She "noticed that the baby had stopped crying."

As she continued towards the apartment, defendant went back inside and closed the door. She could see the door was broken and there were drops of blood on it. The manager called 911 and then tried to get inside the apartment. Defendant resisted by holding the door shut. After less than a minute, defendant let go and the door opened. She watched as he picked up a key-fob off the floor, left the apartment, and "casually walked down to the parking garage."

While still on the phone with the 911 operator, the manager approached the apartment. She saw "a dark puddle of blood between the dining space and the living room space," and "heard a gurgling sound." She went inside and found Moureen on the floor, lying on her back with Kyan across her chest. She checked Moureen for a pulse, but found none. She picked up Kyan and saw he had two large lacerations across the

3

back of his head; she could see his skull showing through. She started basic CPR, and the baby began to breathe.

Within a few minutes, police arrived. They too checked Moureen for vital signs, but found none. The officers helped render first aid to Kyan until paramedics arrived. He was taken to the hospital, where he died.

Officers noticed damage to the front door and door frame consistent with a forced entry. On the living room floor, they found a cell phone broken into several pieces. On the stairway to the upper floor was a duffle bag containing men's clothing. In the kitchen, there was a knife block with empty slots for a steak knife and a butcher knife.

A forensic pathologist testified Kyan had two laceration wounds on the back of his head. One was four inches long and went through Kyan's scalp and into his skull. The other was about three inches long, but went through the dura mater and into the brain. There were also fractures on the right side of the baby's skull. In addition, Kyan had a stab wound on his back that went through his body and exited his chest, cutting his left lung and thymic gland. He died as a result of these "[s]harp-forced injuries of the head and left back."

Moureen had a cut wound to her chin, a cut wound and stab wounds to her neck, stab wounds to her right chest and lower midline neck area, and two stab wounds to her stomach area. One of the neck wounds entered from the front and exited the back, completely severing her jugular vein. One stomach wound near her navel was three to four inches deep, and the stab wound on her right abdomen was five to six inches deep. There was also swelling and bruising on the right side of her face and forehead. The pathologist opined these head injuries likely caused some level of unconsciousness. There were no defensive wounds on Moureen's hands. She died as a result of these "[s]harp-force injuries of the face, neck, chest and abdomen."

Early the next morning, a police officer was at a hospital in Fountain Valley when a security guard approached and directed him to the parking lot where defendant's

4

car was parked. Defendant was asleep in the backseat. Other officers arrived and established a perimeter around the car. They ordered defendant out, but he jumped into the driver's seat, started the car, and backed into a police car positioned behind him. He put the car into drive, drove over a planter, through some bushes, and collided with a minivan parked nearby. Undaunted, defendant then led officers on a high-speed pursuit from the hospital to a nearby park where he finally crashed into another minivan, disabling his car. Defendant got out and fled on foot. He ran through the park and finally dove into a lake. Police set up a perimeter around the lake and ordered defendant to come out. He refused and, after about 15 minutes of noncompliance, a K9 officer sent his dog into the lake. The dog bit defendant on the shoulder and dragged him to shore. Once there, defendant struggled with the officers, requiring them to use a Taser device to finally take him into custody.

A butcher knife with an eight-inch blade was found on the backseat driver's side floorboard of defendant's car. Also inside was a handwritten note on the back of the vehicle's registration stating, "The rage, the anger built to a high. I must take a coward's way out to meet the devil in hell."

Interviewed the next day by police, defendant said that he met Moureen about five years before the killings. He explained they had an on-again off-again relationship, but were eventually married. Kyan was born soon thereafter. Recently, he had moved out of the house twice due to relationship issues. He said Moureen suspected he was having an affair with his coworker, A.B. Defendant explained he was planning on divorcing Moureen to be in a relationship with A.B. He denied he and A.B. had a sexual relationship, but admitted his communications with her were "not appropriate."

On the Saturday before the killings, defendant spent the day with Moureen and Kyan at the beach. He and Moureen talked about how they were going to work on their relationship and how he was going to change his ways. He said he deleted his Facebook account, removed A.B.'s number from his cell phone, and took all the

5

passwords off his phone. He said he was done with A.B. and was not going to talk to her or see her anymore. However, he still thought about A.B.

On the Monday morning of the murders, defendant's mother-in-law left for the day. Defendant took Kyan into his mother-in-law's bedroom and the two of them fell asleep while Moureen was getting ready for work. Defendant said he was awakened abruptly by Moureen, who had found his cell phone and was screaming at him. She told him that their relationship was over, and he needed to pack his "shit" and get out of the house.

As defendant started to pack his belongings, Moureen called defendant's father and told him that defendant needed to get out or "either somebody was going to go to jail or somebody was going to die." Moureen started throwing defendant's clothes out the front door. He retrieved his clothes, but she then threw a pair of his shoes outside. When he went outside to retrieve the shoes, she closed the door and locked him out. This angered him, so he forced the door open. Moureen was talking to someone on the phone and he took it from her and threw it to the floor, breaking it.

Defendant said Moureen then ran out of the apartment and headed towards the front of the complex, where she told a deliveryman to call the police. He grabbed Moureen and took her back to the apartment. He said he told her, "You can't leave like that. The baby's in the apartment by itself. We can't walk away from the - - leave the apartment empty."

Defendant explained that, once back inside, they continued to argue in the dining room. Moureen hit him, which made him angry. That, he said, was "when the knives come out." He pulled a knife from the knife block sitting on the kitchen counter, showed it to her, and told her to stop hitting him. She said, "Don't hurt me. Don't do anything." He said he told her, "We're not going to argue anymore." "Let's just leave each other alone." "The police are probably coming because we made so much noise."

6

He thought that would end the argument, so he put the knife back down on the kitchen counter.

Moureen went into the living room, picked up the baby from the couch, and went into the dining room. Defendant said she started hitting him again while she was holding Kyan. Defendant told her, "Stop hitting me," or "Stop doing all of this to me," and "I just want to pack my things and leave." Defendant insisted they were so involved in their argument that neither of them was paying attention to the baby.

At that point, defendant said he "threw [Moureen] down." He was not sure if he pushed her or pulled her down; he might have grabbed her shoulder, or her hair, but she ended up on the floor. Kyan went down with her, but defendant claimed he did not hit the floor. Defendant was asked if Moureen "fumble[d]" the baby and he replied, "Something like that." Defendant maintained Kyan was actually laughing at that point.

Once Moureen was on the floor, defendant said he jumped in the air and stomped down on her head. He thought she lost consciousness. She did not say anything after that, or even move; "she just laid there in the same spot," still holding the baby.

Defendant said he then went back to the kitchen and retrieved the knife from the counter. He told police he was in a "different mode," and was "locked on Moureen." He returned to the dining room and started slashing at her with the knife. He demonstrated for police exactly how he had held the knife during the attack. Initially, he said he slashed her throat, then her abdomen, and then back to the throat. Later, he corrected himself to say the initial injuries were to Moureen's throat and neck area, and later he moved on to her torso. Defendant remarked the knife was dull. Based on defendant's description of the attack, police concluded he admitted stabbing Moureen at least six times.

Defendant described Moureen as holding Kyan face-to-face during the attack. He was aware Kyan was there, but his focus was on Moureen. He later corrected himself and said he did not recall seeing Kyan as he was slashing at Moureen. He

7

explained that, as he was assaulting Moureen, he noticed Kyan had a laceration on the back of his head. While standing over Moureen, he stood up and suddenly realized the knife was no longer in his hand. He looked over and saw Kyan crawling away crying, with the knife stuck in his back. He pulled the knife out, picked up Kyan, and laid him on top of Moureen's chest, and the baby stopped crying.

Defendant said he then grabbed his car key, left the apartment, got into his car, and fled. He took his cell phone with him, but did not call 911. Instead, he said he told the apartment complex manager to call. He drove around all afternoon and finally ended up at the hospital. In the hospital parking lot, he wrote a suicide note on the back of the vehicle registration. He said he also wrote a similar text message to Moureen, but it failed to send. He then fell asleep in the backseat.

Defendant said he woke up with the police surrounding his car. He thought of trying to commit "suicide by cop," but said he could not find the knife. Instead, he drove away and decided to crash his car in an attempt to kill himself. He got out of his car and ran into the lake, where he claimed he unsuccessfully tried to drown himself.

Defendant told police he had lost control and was in a "fury mode." The only thing that took him out of this "fury mode" was seeing the knife in Kyan's back. He insisted he did not know how Kyan got stabbed in the back, and that he "didn't mean to kill the baby."[1] He did not deny intending to kill Moureen, but said he did not have any control over himself. He admitted he and Moureen had prior arguments that had become physical, but said he never pulled out a knife before.

---

[1] Kyan's murder was predicated on the common law doctrine of transferred intent, where defendant's liability for the baby's killing is wholly derivative of Moureen's murder. (*People v. Bland* (2002) 28 Cal.4th 313, 323-324 ["[A] person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree"].) Defendant does not challenge this aspect of his conviction.

In the defense case, defendant introduced the testimony of five character witnesses, all of whom described defendant as nonaggressive and mild-mannered, and stated he did not have a temper. He also introduced expert testimony from a psychologist. She testified she conducted a forensic evaluation of defendant and concluded he "went into a rage and in the state of rage had dissociative symptoms." She explained, "Dissociation is a phenomenon that occurs when people are under extreme threat or other extreme emotion, anger, usually rage." "In a state where there is dissociation, the person is often acting without control, sometimes without awareness or consciousness."

The defense also introduced two audio files defendant recorded on his phone shortly before the murders. In these recordings, Moureen could be heard accusing defendant of having taken another woman to lunch when he was supposed to be at work. She told defendant to pack up and get out of the house. Defendant told Moureen to calm down, stop hitting and touching him, stop throwing his things, and leave him alone. She asked him why he was playing with people's minds, and reminded him that he had hit her the previous day. Defendant warned Moureen that "if you hit me one more time, we're gonna have a problem." He did not testify.

## DISCUSSION

### 1. Sufficiency of the Evidence

Defendant first contends there was insufficient evidence of premeditation and deliberation. Not so.

#### A. Standard of Review

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

9

doubt." (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104; *Jackson v. Virginia* (1979) 443 U.S. 307, 319 ["[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"].)

In so doing, we "'"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.) "Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation . . . ." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Simply put, given our limited role, a "defendant bears an enormous burden" to prevail on a sufficiency of the evidence claim on appeal. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) This is not such a case.

### B. Analysis and Application

"A murder that is premeditated and deliberate is murder in the first degree." (*People v. Jurado* (2006) 38 Cal.4th 72, 118; Pen. Code, § 189; undesignated statutory references are to the Penal Code.) "'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."' [Citation.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*Jurado,* at p. 118.) Even so, "'[t]he process of premeditation and deliberation does not require any extended period of time.'" (*People v. Koontz* (2002) 27

10

Cal.4th 1041, 1080.) "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citation.] Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).)

Our Supreme Court has identified three basic types of evidence generally found sufficient to sustain a finding of premeditation and deliberation: "(1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason"'" (*People v. Morales* (2020) 10 Cal.5th 76, 89 (*Morales*).)[2]

Here, focusing on the three basic categories, defendant argues the prosecution failed to introduce evidence of planning activity, motive, or manner of killing sufficient to find he committed the murders with premeditation and deliberation, as

---

[2] Even so, these three "'"guidelines are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight."'" (*Morales, supra*, 10 Cal.5th at p. 89; see *People v. Combs* (2004) 34 Cal.4th 821, 850 ["not exclusive, nor are they invariably determinative"].) They are "a framework to aid in appellate review," but do not "define the elements of first degree murder or alter the substantive law of murder in any way." (*Perez, supra*, 2 Cal.4th at p. 1125.) By formulating the guidelines, the Supreme Court "did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." (*Ibid.*) Rather, they did "no more than catalog common factors that had occurred in prior cases." (*Ibid.*)

opposed to as a rash impulse while under the heat of passion. We disagree. All three types of evidence were presented here.

As for planning activity—what defendant did prior to the actual killing showing activity directed toward, and explicable as intended to result in, Moureen's killing—after defendant broke her phone, guaranteeing she could not call for help, Moureen fled the apartment and asked the deliveryman to call 911. Defendant followed, escorted Moureen back to the apartment, took a knife from the butcher block, and threatened her with it. She became fearful, and told him "Don't hurt me." He put the knife back on the kitchen counter, leading her to believe the threat of violence was over. Instead, he returned to the living room, and when the argument resumed, he pushed her to the floor and stomped on her head. This rendered her unconscious and totally unable to call for help or protect herself. Only then did he return to the kitchen, pick the knife up off the counter, come back to the immobile Moureen, and proceed to stab her to death.

Although defendant's final interaction with Moureen was brief, it was more than momentary. This is fully consistent with an inference of a "'cold, calculated judgment'" to kill Moureen, arrived at "'with great rapidity.'" (*Potts, supra,* 6 Cal.5th at p. 1027; cf. *People v. Brady* (2010) 50 Cal.4th 547, 563 (*Brady*) ["[P]remeditation and deliberation can occur in a brief period of time" and "[t]he lack of evidence of extensive planning does not negate a finding of premeditation"]; see also *People v. Wharton* (1991) 53 Cal.3d 522, 547 [the defendant removed murder weapon from toolbox ahead of time and placed it nearby, perhaps "'planning to be in a rage'"].)

Regarding motive—facts about defendant's prior relationship and conduct with the victim—defendant's motive for killing Moureen was his festering anger and frustration. She had caught him cheating yet again, but this time she was ending their relationship and kicking him out of the house, all the while insulting and berating him. On the morning of the murders he had finally had enough, and in fact threatened Moureen that if "you hit me one more time, we're gonna have a problem." She did, and

12

later that day, he made good on that threat. (See *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up resentment toward his victim[] establishes the prior relationship from which the jury reasonably could infer a motive for the killing[]"]; *People v. Disa* (2016) 1 Cal.App.5th 654, 666 [motive based in part on anger that victim was trying to kick him out of the house and had been insulting him].) Although defendant's motivation "was totally unreasonable, this is true of any senseless killing, [and] the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it." (*People v. Pensinger* (1991) 52 Cal.3d 1230, 1238.)

Finally, the manner of Moureen's killing—in a particular way for a reason—also supports an inference of premeditation and deliberation, and demonstrates "a calculated design to ensure death rather than an unconsidered explosion of violence." (*People v. Horning* (2004) 34 Cal.4th 871, 902-903 (*Horning*).) The pathologist testified Moureen was stabbed and slashed multiple times, with injuries throughout her body. Kyan was also slashed and stabbed as he lay on his mother's chest; wounds that would have been inflicted on Moureen had the baby not been positioned on her chest. Indeed, one of Kyan's wounds was a through-and-through stab wound into his back that exited through his chest, indicating a deliberately aimed stabbing motion toward Moureen's torso that was partially blocked by the baby's body.

Thus, the nature of the injuries suggests that they were deliberately designed to kill the incapacitated Moureen. (See *People v. Booker* (2011) 51 Cal.4th 141, 152, 173 [multiple stab and cut wounds to the neck that severed right carotid artery and jugular vein indicates victim was killed deliberately]; see also *People v. Anderson* (1968) 70 Cal.2d 15, 27 ["[D]irectly plunging a lethal weapon into the chest evidences a deliberate intention to kill . . . ."]; *Potts, supra*, 6 Cal.5th at p. 1028 [multiple stab wounds to chest suggests killing was premeditated and deliberate].)

13

More importantly, Moureen was lying on the floor, unconscious and immobile, *before* defendant returned to the kitchen, retrieved the knife off the counter, returned to the dining room, and then proceeded to slash and stab her to death. This shows defendant paused, retrieved his choice of weapon, and after a moment, resumed his attack on Moureen while she was already down. It also supports an inference of a premeditated and deliberate intent to kill. (Cf. *Brady, supra*, 50 Cal.4th at p. 565 ["The manner of the shooting—approaching a prone victim, stopping over him, and then aiming—'shows a calculated design to ensure death rather than an unconsidered explosion of violence'"]; *Horning, supra*, 34 Cal.4th at pp. 902-903 [same for a bound, blindfolded, i.e., "unresisting" victim].)

As he argued to the jury below, defendant now contends the evidence instead points to a contrary conclusion that he was only guilty of voluntary manslaughter because he was so provoked by Moureen that his reasoning was obscured, and he killed her in the heat of passion. He therefore insists he killed her without due deliberation and reflection in "an explosion of violence."

However, "[t]o the extent [defendant] cite[s] evidence or inferences that *would have* supported a contrary finding regarding [his] intent," this "misconstrue[s] and/or misappl[ies] the substantial evidence standard of review." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1366, italics added.) Whether provocation was adequate to negate malice is not a question of law, but rather a factual matter for the jury to decide. (*People v. Beltran* (2013) 56 Cal.4th 935, 950-951 (*Beltran*).) Here the jury was fully instructed on heat of passion, and they rejected it. As a reviewing court on a sufficiency challenge, we must accept any logical inferences the jury might have drawn from the evidence, because "it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) Put simply, "[w]here the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled

14

with the defendant's innocence," or his guilt of a lesser charge. (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747; cf. *Brady, supra*, 50 Cal.4th at p. 565 ["The mere *possibility* of a contrary finding as to defendant's mental state does not warrant a reversal of the guilt judgment"].)[3]

The evidence was sufficient to support the jury's finding that defendant committed deliberate premeditated murder.

## 2. Prosecutorial Misconduct

Defendant next contends the prosecutor committed prejudicial misconduct during his closing argument in his characterization of the law of provocation, and how it affected whether defendant should have been convicted of murder or manslaughter. We find the claim forfeited, but even were we to reach the merits, we find the error was harmless.

### A. Background

During his first closing statement, the prosecutor argued: "Murder has a lesser charge of manslaughter. Manslaughter in this case simply does not apply. It doesn't apply, not because I'm saying it, because the facts don't support it. Heat of passion, defendant was provoked. Once again, the question of who provoked who is one that you guys can answer. As a result, he acted rashly and under the influence of intense emotion that obscured his reasoning and judgment, and the provocation would have caused a person of average disposition to act rashly without due deliberation from passion rather than judgment. The limits of voluntary manslaughter, it's not enough the

---

[3] The defense expert opined defendant was in a "dissociative state" during the murders but, even if true, this evidence at most described defendant's *subjective* reaction to his pent-up anger. As discussed in more detail below, "[a]lthough the defense evidence was probative of whether defendant *subjectively* killed in the heat of passion," from an *objective* standpoint, the evidence "did not establish the requisite provocation necessary for conviction of voluntary manslaughter, rather than murder." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.)

15

defendant simply was provoked. [¶] He is not allowed to set up his own standard of conduct. That is why we look at what a person of average disposition would do in that situation." Up to this point, the prosecutor had correctly stated the relevant law.

However, he then continued and said, "Would the average person of average disposition at any point pull down his wife and son, stomp on her head, and then stab ending." At that point, defense counsel objected on the ground that the prosecutor had misstated the law. She was correct, but the objection was overruled.

The prosecutor continued, "stab, ending their two lives because she wanted him to leave? The answer is no. It's emphatically no. Slight or remote provocation is not sufficient. [¶] Consider whether the person of average disposition, in the same situation, knowing the same set of facts reacted from passion rather than judgment. If enough time has passed between the provocation and the killing for a reasonable person to cool off, then the killing is not reduced to voluntary manslaughter. Voluntary manslaughter, when you guys go into that jury room, should be rejected within 30 seconds in this case." These comments did not misstate the law or the relevant focus of inquiry. But once more, the prosecutor went too far, and said, "That person of average disposition, *how* would they react? It's nowhere near *what this man did*." (Italics added.) These comments were improper, but no objection or request for admonishment was made.

Instead, defense counsel directly responded to the prosecutor's characterization of provocation in her closing comments, and correctly told the jury, "You have heard the prosecutor talk about provocation, a person of average disposition. The instruction does not tell you that what you need to determine is whether this would cause a person of average disposition to kill. That's not what the law says. What the law specifically says is whether it would cause a person to act rashly. That's what the law says." She returned to this point later, stating, "More importantly, for voluntary manslaughter, the focus is on whether [defendant] was provoked and whether, because of

16

the provocation, he acted rashly under that intense emotion." Notably, the prosecutor did not object to her remarks.

Instead, in his rebuttal, the prosecutor stated, "Defense argues, well, it's a manslaughter because a person of average disposition would act rashly. It's the act. Would a person of average disposition *act the way the defendant did on that day*? You look at that whole day, the knocking down – knocked down the phone. Would they break the phone? Would they pull the person back a couple hundred yards? Would they show him the knife? Would they knock down the wife and the child on the ground? Would they stomp on the head? And the answer is no, and the defense knows it. The defense knows it." (Italics added.) These remarks were legally incorrect, but no objection or request for admonishment was made.

The prosecutor's arguments interspersed accurate statements of the law of provocation with patently incorrect ones. (See *People v. Najera* (2006) 138 Cal.App.4th 212, 223-224 (*Najera*) [same provocation error in closing argument].) The correct "focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. *How* the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Id.* at p. 223, italics added; *Beltran, supra*, 56 Cal.4th at p. 949 ["The proper focus is placed on the defendant's *state of mind*, not on his particular *act*" (italics added)].) Simply put, provocation is assessed by whether the average person would *react* to the provocation with his reason and judgment obscured, not by the manner in which he then *acted*.[4] (*Beltran,* at p. 949.)

---

[4] Nevertheless, a killing reaction "is [an] *extraordinary* reaction, the unusual exception to the general expectation that the ordinary person will not kill even when provoked." (*Beltran, supra*, 56 Cal.4th at p. 949.)

17

The trial court instructed the jury on the correct analysis to employ in assessing provocation and heat of passion, and that it was to follow the court's instructions, not the attorneys' description of the law, to the extent there was any conflict.

## B. Forfeiture

To preserve a claim of prosecutorial misconduct at trial, "'"'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety."'"' (*People v. Powell* (2018) 6 Cal.5th 136, 171.) The objection must specifically identify the claim of prosecutorial misconduct and its grounds. (*People v. Hill* (1992) 3 Cal.4th 959, 1011-1012, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) A defendant is excused from the necessity of objecting and requesting an admonition if either would have been futile. (*People v. Farnam* (2002) 28 Cal.4th 107, 167.)

Here, defendant objected once, to remarks that were only partially incorrect, but did not request an admonition. The prosecutor later misstated the law again, but defendant did not object, and thus, never gave the trial court an opportunity to correct the prosecutor's mischaracterizations of the law of provocation. A "point is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858.) Here, posing an additional objection and requesting an admonition would not necessarily have been futile

and would have cured any harm caused by the prosecutor's misstatements.  Defendant's misconduct claim is forfeited.[5]

### C. The Prosecutor's Misstatements Were Harmless

Even had defendant preserved this claim, it would still lack merit.  The prosecutor's partial misstatements of the legal meaning of provocation were cured by both defense counsel's correct statement of the law and the trial court's instructions to the jury.  As such, we conclude it is not reasonably likely the jury understood or applied the complained-of comments in an improper or erroneous manner.

"Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Rhoades* (2019) 8 Cal.5th 393, 418; *Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  Similarly, "[u]nder state law, a prosecutor's action that does not cause fundamental unfairness is prosecutorial misconduct *only* if it involves "'""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" [Citation.]" (*People v. Duong* (2020) 10 Cal.5th 36, 69, italics added.)

Defendant has not claimed the prosecutor used "'deceptive or reprehensible methods'" in an attempt to persuade the jury, or that his misstatements "'""so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)  In addition, defendant makes no allegation

---

[5] For the first time on appeal, defendant argues the prosecutor's closing arguments also denied him his constitutional rights to "due process, equal protection and an impartial jury."  As discussed, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—*and on the same ground*—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841, italics added.)  Here, defendant "made no objections expressly or even impliedly referring to the federal Constitution and thus forfeited the issue." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1332.)

the jury was misinstructed by the trial court, and points to nothing concrete in the record indicating the jury understood or applied the prosecutor's statements in any improper or erroneous manner.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  Instead, "we presume that the jury relied on the instructions, not the arguments, in convicting defendant.  '[I]t should be noted that the jury, of course, could totally disregard *all* the arguments of counsel.'  [Citation.]  Though we have focused on the prosecutor's closing arguments, we do not do so at the expense of our presumption that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'  [Citation.]  The trial court emphasized this rule when, as stated, it instructed the jury to follow its instructions and to exalt them over the parties' arguments and statements." (*People v, Morales* (2001) 25 Cal.4th 34, 47 (*Morales*); see *Najera, supra*, 138 Cal.App.4th at p. 224 [prosecutor interspersed similar correct and incorrect statements on provocation and heat of passion].)  And that is what happened here.

Before closing arguments began, the trial court preinstructed the jury. Those instructions included CALCRIM Nos. 200 and 222, which told the jury it was to base its decision only on the evidence presented, that the attorneys' arguments were not evidence, and that the jury must follow the law as stated by the court, even if the attorneys' comments conflicted with the court's instructions.  In addition, defense counsel directly responded to the prosecutor's mischaracterization of provocation in her closing comments, and correctly told the jury:  "The instruction does not tell you that

20

what you need to determine is whether this would cause a person of average disposition to kill. That's not what the law says. What the law specifically says is whether it would cause a person to act rashly. That's what the law says." Therefore, her comments were bolstered by the trial court's correct previous instructions to the jury regarding the law of provocation and heat of passion.

In these circumstances, we find no "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.) In the context of the entire closing arguments of both counsel, and the instructions the court gave to the jury, defendant has failed to "show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Frye* (1998) 18 Cal.4th 894, 970), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Therefore, "[t]o the extent the alleged instances of misconduct were not forfeited by defendant's failure to object, we conclude none infected the trial with unfairness or deceived the court or jury." (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.)

*3. Motive* (*CALCRIM No. 370*)

Defendant next contends the trial court erroneously instructed the jury with CALCRIM No. 370 regarding the inferences they may draw from the presence or absence of motive evidence. He argues, "[A]n instruction informing the jury evidence of motive was evidence of guilt was misleading and confusing in the extreme" and should not have been given "*under the facts of this case*." (Italics added.) We are not persuaded.

*A. Standard of Review*

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).) In so doing, """"we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.""""" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 915.) We also

21

presume the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) When conducting our inquiry, "'[a] single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.'" (*Covarrubias,* at p. 906; *People v. Richardson* (2008) 43 Cal.4th 959, 1028 [challenged jury instruction is reviewed in context, and not in "'"'artificial isolation'"'"].)

Errors in jury instructions are typically reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178.) In this regard, we "consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Mitchell, supra,* 7 Cal.5th at p. 579; *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.) As such, an instructional error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Breverman,* at p. 165, citing *Watson,* at p. 836, and Cal. Const., art. VI, § 13.)

### B. Analysis and Application

Without objection, the trial court instructed the jury with the standard jury instruction regarding motive, CALCRIM No. 370. The jury was told: "The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

"The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["A party may not argue on appeal that

an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial"].)

Here, defendant did not object to CALCRIM No. 370, and did not request any clarifying modifications. Moreover, defendant does not now assert that the jury instruction is an incorrect statement of the law; rather, only that it should not have been given in this case. After all, the instruction is neutral as to the jury's use of such evidence, and motive is *not* an element of the crime of murder. If defendant had thought the instruction should be clarified to avoid any implication that motive could only be used to establish guilt, he should have so requested. Accordingly, defendant has forfeited this contention on appeal. But even were we to consider the claim on its merits, we would find instructing with CALCRIM No. 370 here was neither erroneous nor prejudicial.

Defendant first argues the prosecution failed to produce any evidence of motive relevant to guilt and insists the only motive evidence adduced actually supported the defense theory of manslaughter. The instruction was therefore misleading, he argues, because his "motivation" was evidence of his innocence, not his guilt, and since the instruction only speaks to using motive to establish *guilt*, the instruction should not have been given.

The argument fails because the first premise is false. As discussed above, the prosecution did introduce motive evidence to support its theory of first degree murder liability. In his closing argument, the prosecutor discussed motive, stating in part: "Motive does not – and I repeat – does not need to be a good reason. It just needs to be [defendant's reason] because, I submit to you, murder, the killing of your wife, the killing of your son, is never a good reason. He was angry. He didn't want to leave. He didn't want to be told what to do by his wife, the wife that he thought about leaving on the Friday he got back because he was really interested in being with someone else."

Motive is ordinarily the incentive for criminal behavior; "why" the crime was committed. Here, the evidence showed defendant was motivated to kill Moureen by

23

his festering anger and pent-up resentment of Moureen's domineering, and his desire to control the marriage, including whether he should stay in it, leave Moureen for A.B., or juggle a relationship with both women. When Moureen had finally had enough of defendant's conduct, she confronted him, ordered him out of the house for good, and thereby motivated his lethal response.

Thus, defendant's underlying "motive" was circumstantial evidence as to whether defendant killed Moureen with deliberation and premeditation. (See *People v. Walker* (2006) 139 Cal.App.4th 782, 796 [in a murder prosecution, proof of motive is material to a finding of premeditation and deliberation]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 [motive can support an inference of ""'a pre-existing reflection'"" and ""'careful thought and weighing of considerations'"" rather than ""'mere unconsidered or rash impulse hastily executed'""]; cf. *People v. Lewis* (2001) 26 Cal.4th 334, 370 [motive is an intermediate fact that may be probative of such ultimate issues as intent]; *People v. Sykes* (1955) 44 Cal.2d 166, 170 ["Motive is a material fact" in any criminal prosecution].) Or, as defendant told Moureen earlier that day, "if you hit me one more time, we're gonna have a problem." She did, and they did indeed have a "problem."

Defendant's second argument, that the motive instruction conflicted with the instructions on voluntary manslaughter, is similarly misplaced because it conflates motive with intent, malice, and premeditation and deliberation, all of which are separate and distinct mental states.

"The Penal Code defines manslaughter as 'the unlawful killing of a human being without malice.' [Citation.] The offense is voluntary manslaughter when the killing is 'upon a sudden quarrel or heat of passion.' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 58.) "[A]n intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation." (*Id.* at p. 59.) "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is

24

provocation." (*Ibid.*) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."'" (*Ibid.*)

The question is not whether defendant *subjectively* believed himself to be so provoked that he went into "fury mode," as he phrased it to police, and thus acted without deliberation and reflection in killing Moureen. Rather, "[t]he test of adequate provocation is an *objective* one. . . . The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee, supra*, 20 Cal.4th at p. 60, italics added.) This is "'because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man."'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

But the motive instruction does not conflict with the heat of passion instructions. "'[M]otive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice.'" (*Covarrubias, supra,* 1 Cal.5th at p. 913.) "Motive, intent, and malice . . . are separate and disparate mental states. The words are not synonyms." (*People v. Snead* (1993) 20 Cal.App.4th 1088, 1098, disapproved on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 181-182.)

As discussed, we assess the entire charge to the jury as a whole, and view the challenged instruction in context with the other instructions to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an

impermissible manner. Here, the trial court instructed the jury on both murder and voluntary manslaughter. In addition, it instructed regarding provocation and heat of passion. (CALCRIM Nos. 522 [provocation] & 570 [heat of passion].) These instructions, when read together with CALCRIM No. 370, correctly conveyed to the jury that it could consider defendant's motive in determining whether he was guilty of *murder*. (See *People v. Cash* (2002) 28 Cal.4th 703, 739 ["[T]he instructions as a whole did not use the terms 'motive' and 'intent' interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous"].) Thus, it was up to the jury to determine whether defendant's motive tended to establish premeditation and deliberation for purposes of first degree murder, not to assist it with the distinct inquiry into the mitigated offense of voluntary manslaughter. There was no instructional conflict. Consequently, even assuming the claim was not forfeited, giving the standard instruction on motive here was not error. [6]

*4. Consciousness of Guilt* (*CALCRIM Nos. 362, 371 & 372*)

Defendant next contends the trial court erred by giving three instructions relating to consciousness of guilt: CALCRIM Nos. 362 ["Consciousness of Guilt: False Statements"]; 371 ["Consciousness of Guilt: Suppression and Fabrication of Evidence"]; and 372 ["Defendant's Flight"]. The instructions related to the evidence defendant lied to the apartment manager about Kyan being fine, took the butcher knife he used to kill the victims with him and hid it in his car, fled from the murder scene, and later from police when surrounded. The prosecutor argued this evidence supported inferences of defendant's consciousness of guilt, i.e. that "he was aware of his guilt."

---

[6] In support of his contentions about the motive instruction, defendant cites *People v. Lee* (1990) 219 Cal.App.3d 829, and *People v. Martinez* (1984) 157 Cal.App.3d 660. Neither case is of any assistance here because both were entrapment defense cases, where a motive instruction should *never* be given since motive is *irrelevant* in an entrapment case. (*Lee,* at p. 841; *Martinez,* at p. 669.)

Defendant claims giving these instructions was improper because he admitted he stabbed the victims, and the only disputed issue was whether he committed the killings with premeditation and deliberation, or in the heat of passion. Thus, he insists, the instructions should not have been given because they were "confusing, misleading, and inappropriate."

Our Supreme Court has repeatedly rejected similar claims. In *People v. Thornton* (2007) 41 Cal.4th 391, the trial court gave the CALJIC versions of the three CALCRIM instructions defendant contests here. (*Id.* at pp. 437-438.) On appeal, the defendant argued the instructions were improper because his identity was not at issue. The Supreme Court disagreed, stating "[i]nstructions on consciousness of guilt are proper not only when identity is at issue, but also when 'the accused admits some or all of the charged conduct, merely disputing its criminal implications.'" (*Id.* at p. 438; see also *People v. Martinez* (2009) 47 Cal.4th 399, 450 ["'[W]e have repeatedly rejected the argument that instructions on consciousness of guilt" are "inappropriate where mental state, not identity, is the principal disputed issue'"]; *People v. Moon* (2005) 37 Cal.4th 1, 28 [same for flight instruction].)

By pleading not guilty, defendant put in issue all of the elements of the charged offenses and allegations. Even though he essentially conceded his guilt of some form of criminal homicide at trial, "'the prosecution [was] still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent.'" (*People v. Moon, supra*, 37 Cal.4th at p. 28; see *People v. Henriquez* (2017) 4 Cal.5th 1, 29-30 [same]; *People v. Turner* (1990) 50 Cal.3d 668, 694, fn. 10, and cases cited there ["the prosecution was entitled to use evidence of guilty flight to help prove the defendant's criminal state of mind"]; cf. *People v. Burton* (2018) 29 Cal.App.5th 917, 925 ["any consciousness of guilt evidenced by defendant's [lies to police] would operate as to any

27

degree of homicide, not merely first degree murder"].)[7] The court did not err by giving the consciousness of guilt instructions.

5. *The Parole Revocation Fine*

Finally, defendant contends the imposition of a parole revocation fine on his life without the possibility of parole sentences was error, and it must be stricken. The Attorney General agrees. Both have misread the record.

It is true that a parole revocation fine can only be imposed where a defendant's sentence includes a possible future period of parole. (See § 1202.45, subd. (a).) By definition, a life without parole sentence does not include a potential period of parole, so any such fine here would have been improper. (*People v. McWhorter* (2009) 47 Cal.4th 318, 380.) However, the record shows no such fine was imposed. The trial court initially did impose a $300 parole revocation fine under section 1202.45. However, at a later hearing, the court recalled the case for resentencing and, among other things, granted defendant's motion to waive all previously imposed fines and fees based on his inability to pay them—including the parole revocation fine. The abstract of judgment further confirms no parole revocation fine was imposed.

The parties both refer to a $10,000 "parole revocation fine." However, that fine was a restitution fund fine, imposed to reimburse "the Victims Compensation and Government Claims Board" for "money that has been forwarded to the victims' family by the . . . Victims Compensation Claims Board." (See §1202.4, subd. (f)(4)(A).) Section 1202.45 does not limit restitution fund fines based on a defendant's parole

---

[7] Defendant also argues that because he did not contest that he stabbed the victims to death, these instructions allowed the jury to draw constitutionally impermissible inferences from the facts. However, this claim is based on the same faulty premise that consciousness of guilt instructions should only be given "where the defendant denies guilt." Our Supreme Court has rejected similar constitutional claims in *People v. Mendoza* (2000) 24 Cal.4th 130, 179-181, superseded by statute on other grounds in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8, and *People v. Smithey* (1999) 20 Cal.4th 936, 983.) As do we.

possibilities.  Defendant's contention is therefore factually misplaced, and the Attorney General's similarly flawed concession is rejected.  There was no sentencing error.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.